IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JULIE E. DIEMER, | ) | |
| | ) | Case No. 05 C 7179 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| FRATERNAL ORDER OF POLICE, | ) | |
| CHICAGO LODGE 7, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Julie E. Diemer ("Diemer" or "Plaintiff") filed suit against defendant Fraternal

Order of Police, Chicago Lodge 7 ("FOP" or "Defendant") alleging that the FOP fired her due to

her pregnancy and her gender in violation of Title VII of the Civil Rights Act of 1964 as amended

by the Pregnancy Disability Act ("PDA") and the Civil Rights Act of 1991, 42 U.S.C. §2000(e) et

seq.  The FOP moves for summary judgment on Diemer's pregnancy discrimination claim.  For the

reasons set forth below the FOP's Motion for Summary Judgment is denied.

## STATEMENT OF FACTS

Plaintiff Julie Diemer worked as an in-house attorney for the FOP from approximately

August 4, 2003 through November 2, 2004, when she was  terminated.[1]  (Pl. 56.1 Resp. at ¶ 1; Def.

---

[1]  Citations to "Plaintiff's Response to Defendant's Statement of Material Facts In Support of its
Motion for Summary Judgment" have been abbreviated to "Pl. 56.1 Resp."  Citations to "Defendant's
Response to Plaintiff's Local Rule 56.1 Statement of Additional Facts" have been abbreviated to "Def. 56.1
Resp."

As discussed below, the parties dispute whether Diemer resigned from her in-house attorney position
with the FOP or whether she was terminated by the FOP.  Defendant refers to Diemer's cessation of
employment as her "resignation" as well as her "termination." (*See, e.g.,* Pl. 56.1 Resp. at ¶ 72; (termination);
Def. Mem. Supp. Summ. J. 9 (termination); Def. Mem. Supp. Summ. J. at 23 n. 9 (resignation); Def. Rep.

56.1 Resp. at ¶ 130.) The bulk of Diemer's duties as an in-house attorney involved handling "standard" and "medical" grievances and arbitrations.[2] (Pl. 56.1 Resp. at ¶¶ 3, 7; Def. Ex. 6, Diemer Dep. at 160.) Diemer's duties also included some state and federal litigation, administrative hearing matters, writing memoranda to the FOP's Legal Defense Committee, and coordinating with outside counsel. (Pl. 56.1 Resp. at ¶ 3; Def. Ex. 6, Diemer Dep. at 159-60.)

The FOP employed two attorneys in addition to Diemer during Diemer's employment: Paul Geiger ("Geiger") and Thomas Pleines ("Pleines"). (Pl. 56.1 Resp. at ¶ 4.) Geiger was hired by the FOP as a staff attorney on October 16, 2002. (*Id.*) Geiger's duties include handling medical and psychological grievances, civil litigation, and "walk-in" police officer matters. (Pl. 56.1 Resp. at ¶ 8.) Geiger worked as a solo practitioner from 1994 through 2002, prior to joining the FOP. (Pl. Ex. 12, Geiger Dep. at 20-21.) As part of his practice, Geiger represented members of the FOP in *Loudermill* and Police Board termination hearings, and was paid by the FOP for this work. (Def. 56.1 Resp. at ¶ 123; Pl. 56.1 Resp. at ¶ 8.)

In 2001, Geiger was paid by the FOP to file a petition in state court for administrative review challenging the termination of police officer Gerald Weber ("the Weber matter"). (Def. 56.1 Resp. at ¶ 124.) Because Geiger filed the petition after the statute of limitations expired, the City of Chicago filed a motion to dismiss the appeal. (Def. 56.1 Resp. at ¶ 125.) In response, Geiger voluntarily dismissed the case. (*Id.*; Pl. Ex. 12, Geiger Dep. at 202.) Geiger never informed Donahue, who was not President at the time of the Weber matter, or Dougherty, who did not become

Br. 4 (resignation).) For clarity and ease of use, the Court will refer to Diemer's cessation of employment as her "termination."

[2] Standard grievances involved contentions that the Chicago Police Department had violated the collective bargaining agreement. (Pl. 56.1 Resp. at ¶ 3.) Medical grievances included claims stemming from injuries on duty, health bills, and contract questions. (*Id.*)

Vice-President until the following year, about the Weber matter. (Def. 56.1 Resp. at ¶ 127; Pl. 56.1 Resp. at ¶ 2; Pl. Ex. 12, Geiger Dep. at 202-03.) In addition, Geiger claims that he was not supervised by anyone at the FOP at the time of the Weber matter. (Def. 56.1 Resp. at ¶ 124; Pl. Ex. 12, Geiger Dep. at 203.)

Pleines joined the FOP as its General Counsel in 1993. (Pl. 56.1 Resp. at ¶ 4.) As General Counsel, Pleines' duties included distributing work to Geiger and Diemer and assisting the two attorneys as necessary. (Pl. 56.1 Resp. at ¶ 6.) In addition, Pleines handled standard and medical grievances as well as civil litigation, participated in collective bargaining negotiations, selected arbitrators, represented police officers before the Pension Board, coordinated matters sent to outside counsel, and reviewed bills from outside counsel. (*Id.*)

In 1996, Pleines, in his capacity as an attorney for the FOP, worked with Laura Finnegan, an outside lawyer, in the representation of a group of police officers in *Majeske v. Fraternal Order of Police*, 94 F.3d 307 (7th Cir. 1996). (Pl. 56.1 Resp. at ¶ 68; Def. 56.1 Resp. at ¶ 121; Pl. Ex. 14, Pleines Dep. at 190.) While the case was on appeal before the Seventh Circuit, Finnegan and Pleines missed a scheduled oral argument because they went to the wrong courtroom. (Pl. 56.1 Resp. at ¶ 67.) Pleines did not inform William Nolan, or First Vice President, Robert Podgorny, that he and Finnegan missed the oral argument. (Def. 56.1 Resp. at ¶ 122.)

Lockup Closure Brief

In approximately July 2004, Diemer was assigned to handle the arbitration in a case referred to as the "Lockup Closure" matter. (Pl. 56.1 Resp. at ¶ 10.) Before the July 12, 2004 filing deadline, Fallon reviewed a draft of a brief prepared in the matter ( the "Lockup Closure brief") and observed that the draft contained spelling and grammatical errors and mistakes regarding the use of

police vernacular.  (Pl. 56.1 Resp. at ¶¶ 11, 12.)  Fallon subsequently told Diemer to fix the errors related to spelling, grammar, and the use of police vernacular.  (Pl. 56.1 Resp. at ¶ 13.)

After the filing deadline, Fallon reviewed a version of the Lockup Closure brief that he understood to be the version sent to the arbitrator and observed that the brief still contained a number of errors.  (Pl. 56.1 Resp. at ¶ 14; Def. Ex. 11, Fallon Dep. at 92.)  Fallon later discussed these problems with Donahue, who considered the brief "awful," as well as with Dougherty.  (Pl. 56.1 Resp. at ¶ 15.)  Concerned that future briefs would be filed with errors, Fallon also discussed with Dougherty and Donahue a new policy relating to the review of legal briefs.  (Pl. 56.1 Resp. at ¶ 16; Def. Ex. 11, Fallon Dep. at 92.)  Shortly after July 12, 2004, Fallon announced The Peer Review Policy, which required all briefs to be reviewed by two in-house attorneys before the briefs were sent out.  (Pl. 56.1 Resp. at ¶¶ 16, 17; Def, 56.1 Resp. at ¶ 76.)  The parties dispute whether the policy also required that Fallon review all briefs before they were sent out or filed by the attorneys.  (Pl. 56.1 Resp. at ¶¶ 16, 17; Def, 56.1 Resp. at ¶ 76.)

<u>Diemer's Pregnancy Announcement and Initial Performance Evaluation</u>

In August 2004, Diemer informed Geiger that she was pregnant. (Def. 56.1 Resp. at ¶ 130.) She did not disclose her pregnancy to anyone else at the FOP until September 4, 2004, when she met with Donahue and Dougherty to discuss her workplace performance.  (*Id.*;  Pl. 56.1 Resp. at ¶ 19.) According to Diemer, Donahue told her that she was doing a great job and that everyone was happy with her work.[3]  (Pl. 56.1 Resp. at ¶ 20, Def. 56.1 Resp. at ¶ 81.)  Towards the end of this meeting,

_____

[3] In Defendant's Statement of Material Facts, Defendant states, "According to Diemer, Donahue told her she was doing a great job and everybody was happy with her work."  (Pl. 56.1 Resp. at ¶ 20.)  The purpose of Rule 56.1 is to set forth undisputed material facts.  Rather than adhering to the directive of Rule 56.1 and affirmatively stating facts, Defendant instead clutters its Statement of Material Facts with multiple assertions - similar to this statement - that Diemer testified in a certain manner.  Such statements are unhelpful to the Court as they fail to establish much more than the fact that Diemer testified in a certain manner.

Diemer told Donahue and Dougherty that she was pregnant, was due in March 2005, and would be taking eight to twelve weeks of leave under the Family Medical Leave Act. (Pl. 56.1 Resp. at ¶ 21.)

### The *Moseley* Brief

In September 2004, at Pleines's request, Diemer assisted with the preparation of a brief in the case of *Moseley v. Retirement Board* ("the *Moseley* brief"). (Pl. 56.1 Resp. at ¶ 22.) Pleines instructed Diemer to file the *Moseley* brief by September 27, 2004. (*Id.*) On September 27, 2004, Diemer emailed a version of the *Moseley* brief to Michelle Moorman ("Moorman"), FOP legal secretary to Diemer, Geiger, and Pleines, and subsequently gave the *Moseley* file to Geiger. (Pl. 56.1 Resp. at ¶¶ 23, 35; Def. 56.1 Resp. at ¶ 129.) Diemer also offered to proof-read the brief she submitted, but Geiger declined her offer. (Def. 56.1 Resp. at ¶ 129.)

Geiger and Pleines then reviewed the *Moseley* brief that same day and, after concluding that the brief was of very poor quality, rewrote the brief in an effort to timely file it on September 27. (Pl. 56.1 Resp. at ¶ 24.) Pleines later informed Fallon that Diemer's draft of the *Moseley* brief was of poor quality and that it had to be rewritten by Pleines and Geiger. (Pl. 56.1 Resp. at ¶ 25.)

### The Canine Handler Brief

Diemer was also assigned to handle a brief referred to as the "Canine Handler brief." (Pl. 56.1 Resp. at ¶ 26.) On the afternoon of October 18, Diemer submitted a draft of the Canine Handler brief to Geiger for review. (*Id.*) After Diemer received Geiger's suggested changes later that day, she inputted Geiger's changes and sent out the brief without review by Fallon or any further review by Geiger. (*Id.*)

### The Timothy Thomas Brief

Diemer also drafted the arbitration brief in a matter referred to as the "Timothy Thomas arbitration." (Pl. 56.1 Resp. at ¶ 27.) Diemer did not have the brief reviewed by an FOP attorney before sending it out, as required by the Peer Review Policy. (Pl. 56.1 Resp. at ¶ 28.) Fallon subsequently informed Donahue of Diemer's failure to have the brief reviewed and, in October 2004, Donahue spoke with Diemer about Diemer's failure to follow the Peer Review Policy. (Pl. 56.1 Resp. at ¶ 29; Def. Ex. 6, Diemer Dep. at 219.) During the discussion, Diemer admitted that she sent the brief without review, apologized to Donahue for this failure, and agreed to have her briefs reviewed in the future. (Pl. 56.1 Resp. at ¶ 29; Def. 56.1 Resp. at ¶ 86.) Donahue then admonished Diemer in a half-joking manner,[4] but did not remark on the quality of the brief. (Def. 56.1 Resp. at ¶¶ 86, 87.) In addition, Diemer claims that Donahue made a statement to the effect of "let me just sit here for a minute so it looks like I'm really reading you the riot act." (Pl. 56.1 Resp. at ¶ 29.)

The parties dispute whether Diemer and Donahue met once or twice to discuss Diemer's failure to follow the Peer Review Policy in October 2004. (Pl. 56.1 Resp. at ¶ 30.) They also dispute whether Donahue spoke to Diemer about failing to have *one brief* reviewed or *briefs* reviewed. (*Id.*)

### The *Taylor* Matter

In her capacity as an FOP attorney, Diemer also represented Chicago Police Officer Thomas Taylor in a matter regarding Officer Taylor's application to register a firearm (the "*Taylor* matter").

---

[4] Defendant denies Diemer's characterization of Donahue's admonishment, but fails to provide any citation to the record in support of this denial. Under the Local Rules of the Northern District of Illinois, a summary judgment response claiming insufficient information to admit or deny is improper and constitutes an admission. *Vlasek v. Vill. of Homewood*, No. 01 C 5870, 2004 U.S. Dist. LEXIS 10422, at *2 (N.D. Ill. June 27, 2004) (*citing McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998)). Thus, the Court deems this fact admitted for the purposes of summary judgment.

(Pl. 56.1 Resp. at ¶ 31.)  On March 4, 2004, the Mayor's License Commission issued an Order denying Officer Taylor's appeal of a previous denial of Officer Taylor's application to register a firearm.  (*Id.*)  The Order provided that the Officer Taylor could further appeal the Order by filing a Writ of Certiorari in the Circuit Court within six months of service of the Order and that a failure to file a timely appeal would bar any further judicial review of the Order.  (*Id.*)

In response, Diemer researched the question of what she needed to file with the court in order to pursue further relief on behalf of Officer Taylor.  (Pl. 56.1 Resp. at ¶ 32.)  This research revealed that she needed to file a common law Writ of Certiorari.  (*Id.*)  The parties dispute whether, at some point, Pleines told Diemer to file a Complaint of Mandamus.[5]  (Pl. 56.1 Resp. at ¶ 33.)

On September 10, 2004, Diemer prepared and filed a Complaint for Mandamus on behalf of Officer Taylor.  (Pl. 56.1 Resp. at ¶ 34.)  On October 14, 2004, the City of Chicago filed a Motion to Dismiss the Complaint ("the Motion") because the action was not brought within the applicable six-month limitations period and because the Complaint was not the proper form of review.  (*Id.*)  The Motion was scheduled for presentment before the court on October 27, 2004.  (Pl. 56.1 Resp. at ¶ 35.)

The FOP, via Moorman, received the City's Motion on October 15, 2004.  (*Id.*)  After reviewing the Motion, Moorman created an entry for the October 27 motion hearing in the FOP's electronic calendar[6] (the "October 27 entry").  (*Id.*; Moorman Aff. at ¶ 14.)  The October 27 entry

_____

[5] Defendant's Statement of Material Facts states that "Diemer testified that. . . Pleines told her to file a Complaint for Mandamus." (Pl. 56.1 Resp. at ¶ 33.)  Defendant's own record directly contradicts Diemer's statement that Pleines told her to file a Complaint for Mandamus.  (Def. Ex. 18, Pleines Aff. at 3.)  Thus, this is a disputed fact for the purposes of summary judgment.

[6] During Diemer's employment, the FOP did not have a formal policy regarding entering appointments in its electronic calendar.  (Def. 56.1 Resp. at ¶ 101.)  The entire FOP staff could view, enter, and delete appointments within the calendar.  (Def. 56.1 Resp. at ¶ 101.)

reflected the nature of the Motion, noted that the Motion would be heard on October 27, 2004, and listed Diemer as the handling attorney. (Pl. 56.1 Resp. at ¶ 35; Moorman Aff. at ¶ 14.) Per Diemer's instructions, Moorman then placed the Motion on Diemer's desk. (Pl. 56.1 Resp. at ¶ 36; Def. 56.1 Resp. at ¶ 88; Def. Ex. 6, Diemer Dep. at 237.)

On either October 15, 2004 or October 18, 2004, Moorman also spoke with Geiger about the Motion. (Pl. 56.1 Resp. at ¶ 37; Moorman Aff. at ¶ 15.) Moorman informed Geiger of the Motion (stating "we blew a statute") and of her entry in the electronic calendar for the October 27, 2004 presentment date. (Pl. 56.1 Resp. at ¶¶ 37, 38; Moorman Aff. at ¶ 16.) When Geiger subsequently checked the electronic calendar for details regarding the presentment of the Motion, he did not find the October 27 electronic entry. (Pl. 56.1 Resp. at ¶ 38; Def. Ex. 13, Geiger Dep. at 139-40.) Moorman also examined the electronic calendar, but could not locate the October 27 entry.[7] (Moorman Aff. at ¶ 17.)

On October 18, 2004, Geiger informed Dougherty of the Motion and told Dougherty that he would "look into it" and get back to him. (Def. 56.1 Resp. at ¶ 90.) Rather than ask Diemer for a copy of the Motion, Geiger searched Diemer's office for the *Taylor* file and Motion almost every work day between October 18 and October 29. (Def. 56.1 Resp. at ¶ 94.) While the Motion remained in a stack of papers on Diemer's desk until October 26, 2004, Geiger did not find the Motion. (Def. 56.1 Resp. at ¶¶ 88, 94; Pl. 56.1 Resp. at ¶ 44.) Geiger was most concerned with the October 27 entry, which he assumed Diemer had removed. (Pl. 56.1 Resp. at ¶ 44; Def. Ex. 13, Geiger Dep. at 146-47.)

---

[7] The record is unclear as to whether Moorman and Geiger checked the entry together or independently.

After examining the Motion on October 26, Diemer concluded that the City's assertion in the Motion regarding the untimeliness of Diemer's pleading was likely correct. (Pl. 56.1 Resp. at ¶ 40.) The next day, Diemer appeared in court on the Motion and a briefing schedule for the Motion was entered. (*Id.*) From October 27, 2004 through November 1, 2004, the Notice of Motion, Motion, and the Order entered by the court remained in Diemer's briefcase. (Def. 56.1 Resp. at ¶ 91.)

The parties dispute when Diemer first informed anyone at the FOP of the Motion. Diemer testified that she discussed the Motion with Geiger on October 28, 2004. (Pl. 56.1 Resp. at ¶ 41.) Geiger testified that this conversation occurred on November 2, 2004. (*Id.*) When Diemer did inform Geiger of the Motion, she also expressed her concern about the untimely filing and stated that her actions could constitute potential malpractice if she could not cure the mistake. (Pl. 56.1 Resp. at ¶ 42.) Diemer also presented a plan to cure the mistake that involved reimbursing Officer Taylor for the purchase of a new gun, having Officer Taylor attempt to register the gun, and representing Officer Taylor in an appeal if his registration application was denied. (*Id.*) Geiger did not tell Diemer that he was already aware of the Motion. (Def. 56.1 Resp. at ¶ 92.)

On Friday, October 29, 2004, Geiger and Moorman spoke with Dougherty regarding the Motion. (Def. 56.1 Resp. at ¶ 96; Pl. 56.1 Resp. at ¶ 45; Def. Ex 10, Dougherty Dep. at 106-07.) Geiger and Moorman informed Dougherty that the City filed a motion to dismiss, that an entry had been created in the FOP electronic docket for the October 27 hearing, that the entry had been later removed, and that the electronic docket still did not reflect the entry.[8] (Pl. 56.1 Resp. at ¶ 45.)

---

[8] Diemer objects to Moorman's testimony as inadmissible hearsay. (Pl. 56.1 Resp. at ¶ 45.) Moorman's statements are offered for the purposes of demonstrating Dougherty's belief and intent, not for the truth of the matter asserted, and are not hearsay. *See Brill v. Lante Corp.*, 119 F.3d 1266, 1271 (7th Cir. 1997).

Geiger further advised Dougherty that Diemer was not in the office on October 27, 2004 when the Motion was set to be heard in court. (Def. 56.1 Resp. at ¶ 96.) Without asking Diemer what had occurred with the Motion, Geiger concluded that Diemer had attempted to and succeeded in hiding a "mistake."[9] (Def. 56.1 Resp. at ¶ 96; Pl. Ex. 12, Geiger Dep. at 165.) Dougherty never independently checked the FOP's electronic calendar for the October 27 entry. (Def. 56.1 Resp. at ¶ 96.) Instead, Dougherty directed Geiger to retrieve a copy of the Motion from the court file. (Pl. 56.1 Resp. at ¶ 45.)

At some point between October 29, 2004 and November 1, 2004, Dougherty advised Donahue of the Motion. (Def. 56.1 Resp. at ¶ 98.) The record indicates that Dougherty, who was responsible for the oversight of the *Taylor* case, told Donahue that Geiger had informed Dougherty of the misfiling and that Diemer had attempted to "secret" the matter from the FOP when she learned about it.[10] (Pl. 56.1 Resp. at ¶ 49; Def. 56.1 Resp. at ¶¶ 103-04; Def. Ex. 9, Donahue Dep. at 152, 154.) The discussion regarding Diemer "secreting" information was based on the creation and subsequent removal of the October 27 electronic docket entry as well as on Diemer's failure to promptly inform any of the FOP's officers of the misfiling when Diemer became aware of the issue.[11] (Pl. 56.1 Resp. at ¶ 50; Def. Ex. 9, Donahue Dep. at 162-63.) The parties dispute whether

---

[9] Plaintiff's Local Rule 56.1 Statement of Additional Facts is unclear as to when Geiger came to this conclusion. (Def. 56.1 Resp. at ¶ 96.)

[10] The parties fail to specify whether this conversation occurred when Dougherty first advised Donahue of the Motion at some point between October 29 and November 1 or at a later date.

[11] The parties provide two different definitions of the phrase "secreting." Defendant asserts and Plaintiff admits that the "secreting" discussion related to the creation and removal of the docket entry as well as Diemer not promptly informing FOP officers of the misfiling when she became aware of the issue. (Pl. 56.1 Resp. at ¶ 50.) Plaintiff later describes secreting as not informing the FOP of the misfiling when Diemer became aware of the matter. (Def. 56.1 Resp. at ¶ 103.) The Court finds that the two definitions are not inconsistent and, drawing all reasonable inferences in favor of Diemer, adopts the broader definition of

10

Dougherty's conclusion regarding the "secreting" was based solely on information provided by Geiger. (Def. 56.1 Resp. at ¶ 103.) Because of the untimely filing and "secreting," Dougherty recommended that Diemer be fired. (*Id.*)

Donahue further testified that he also discussed the *Taylor* matter with Geiger individually in order to verify what Dougherty had relayed to Donahue regarding the misfiling and "secreting."[12] (*Id.*)

At Dougherty's direction, Geiger retrieved the Motion from the court's file on Monday, November 1, 2004. (Pl. 56.1 Resp. at ¶ 45.) After reviewing the Motion, Geiger gave a copy to Dougherty and discussed with Dougherty his conclusions regarding the Motion. (Def. 56.1 Resp. at ¶ 97; Def. Ex. 13, Geiger Dep. at 149.) Specifically, Geiger told Dougherty that the pleading was filed incorrectly, and that "the case was sunk" and "was a lost cause." (Def. 56.1 Resp. at ¶ 97; Def. Ex. 13, Geiger Dep. at 149-50.)

That same day, Diemer also discussed the *Taylor* matter with Geiger. (Def. 56.1 Resp. at ¶ 95; Pl. 56.1 Resp. at ¶ 43.) Diemer told Geiger that she needed to apprise the FOP officers of what had occurred and asked Geiger whether she should speak with Donahue or Dougherty, or both. (Pl. 56.1 Resp. at ¶ 43; Pl. Ex. 7, Diemer Dep. at 253.) In response, Geiger told Diemer to speak with Dougherty. (Pl. 56.1 Resp. at ¶ 43; Pl. Ex. 7, Diemer Dep. at 253.)

---

"secreting," which addresses both the removal of the October 27 entry as well as Diemer's failure to immediately inform the FOP of the misfiling.

[12] Plaintiff frames this statement as one regarding what Donahue testified to, rather than as affirmatively stating the fact at issue. As previously discussed, this statement establishes only that Donahue *testified* that Geiger verified Dougherty's statements to Donahue regarding Diemer's "secreting." It does not prove, however, that Donahue, in fact, discussed the "secreting" issue with Geiger. Thus, the Court concludes that the record is unclear as to whether Geiger discussed the "secreting" issue with Donahue.

Thereafter, on November 2, 2004, Dougherty met with Diemer at Diemer's request to discuss, for the first time, the *Taylor* matter. (Def. 56.1 Resp. at ¶ 100; Pl. 56.1 Resp. at ¶ 46.) Diemer informed Dougherty of her untimely filed complaint and the City's Motion. (Pl. 56.1 Resp. at ¶ 46.) She also apologized for her mistake and told Dougherty that the City would most likely prevail on the Motion. (Pl. 56.1 Resp. at ¶ 46.) Diemer advised Dougherty that the FOP had two options: respond to the Motion or voluntarily dismiss the case. (*Id.*) Diemer informed Dougherty of her alternative plan to have Officer Taylor purchase and attempt to register a new gun. (*Id.*) She also stated that she felt as though she had a duty to cure the harm to Officer Taylor and that the failure to do so could potentially result in malpractice. (Pl. 56.1 Resp. at ¶ 47.) In response, Dougherty told Diemer that he would have to see how Donahue would like to proceed. (*Id.*) Diemer did not discuss with Dougherty why she did not inform Dougherty of this earlier, nor was she asked to do so. (*Id.*; Pl. Ex. 16, Diemer Aff. at ¶ 8.) At the conclusion of the meeting and upon his request, Diemer gave Dougherty the *Taylor* file and the Motion. (Def. 56.1 Resp. at ¶ 100; Def. Ex. 6, Diemer Dep. at 259.)

<u>The FOP's November 2, 2004 Meeting</u>

Subsequently, on November 2, Dougherty and Geiger discussed Diemer's handling of the *Taylor* matter in a meeting attended by Donahue, Dougherty, Fallon, Geiger, and Pleines. (Pl. 56.1 Resp. at ¶ 48, Def. 56.1 Resp. at ¶ 103.) Dougherty reported to the group that Diemer had filed the tardy complaint, that the City had filed a motion to dismiss, and that Moorman's October 27 entry had been removed from the electronic calendar as well as how he was informed of the matter. (Pl. 56.1 Resp. at ¶ 48; Def. Ex. 10, Dougherty Dep. at 126-27.) Dougherty did not mention to the others whether he had confirmed that Diemer had misfiled the Motion. (Def. 56.1 Resp. at ¶ 104.)

Dougherty testified that he also relayed to the group that Diemer admitted she had committed malpractice. (Pl. 56.1 Resp. at ¶ 48; Def. Ex. 10, Dougherty Dep. at 125-26.) The parties dispute whether Dougherty also erroneously told the group, based on his conversation with Geiger, that the Motion was already granted. (Def. 56.1 Resp. at ¶ 103; Def. Ex. 10, Dougherty Dep. at 126-27.) In addition, Dougherty told the group that he did not feel as though he could trust Diemer as an attorney because of how she handled the *Taylor* case. (Pl. 56.1 Resp. at ¶ 50; Def. Ex. 11, Fallon Dep. at 134.) In his affidavit, Dougherty stated that he questioned whether Diemer could be trusted to continue to handle FOP legal matters because she had not "promptly" brought the serious nature of the Motion to the attention of the FOP's officers and because the October 27 entry had been deleted from the FOP's electronic calendar. (Pl. 56.1 Resp. at ¶ 49; Def. Ex. 16, Dougherty Aff. at ¶ 3.)

Geiger's input during the meeting regarding this decision was limited to his understanding of issues related to the *Taylor* matter. (Pl. 56.1 Resp. at ¶ 53; Def. Ex. 15, Donahue Aff. at ¶ 6.) The parties dispute and the record is unclear as to whether Geiger informed the others at the November 2 meeting of his two conversations with Diemer regarding the Motion. (Def. 56.1 Resp. at ¶ 104.) Prior to the conclusion of this meeting, Fallon also discussed prior problems that Fallon had with Diemer's writing skills and her failure to have briefs reviewed by other attorneys.[13] (Def. 56.1 Resp. at ¶ 132; Pl. 56.1 Resp. at ¶ 51.) Fallon did not identify any particular briefs during this discussion. (Pl. 56.1 Resp. at ¶ 51.) The record is unclear and the parties dispute whether Fallon

---

[13] Diemer admits that the group discussed this issue, but denies the assertion that a problem, in fact, existed with Diemer's failure to have *multiple briefs* reviewed, rather than just *one brief* reviewed. Pl. 56.1 Resp. at ¶ 51.

limited his comments to his concerns regarding Diemer's writing and submission of briefs. (Def. 56.1 Resp. at ¶ 132.)

By the end of the meeting, the group "was lead to the conclusion" that Diemer had attempted to hide something adverse. (Def. 56.1 Resp. at ¶ 104.) Dougherty also testified that, becuse of a "trust factor," the group felt that Diemer should be fired.[14] (Pl. 56.1 Resp. at ¶ 49; Def. Ex. 10, Dougherty Dep. at 133.) The group agreed that Diemer would be offered the opportunity to resign and, if she chose not to resign, she would be terminated. (Pl. 56.1 Resp. at ¶ 52.) Donahue directed Pleines, who had previously advised Donahue of the FOP's legal options with regard to Diemer during the meeting, to draft a letter of resignation for Diemer to sign. (Def. 56.1 Resp. at ¶ 132; Pl. Ex. 14, Pleines Dep. at 111.) The record is unclear and the parties dispute whether Pleines limited his comments during the meeting to the FOP's legal options with regard to Diemer. (Def. 56.1 Resp. at ¶ 132.) Diemer's pregnancy was not discussed during the November 2 meeting. (Pl. 56.1 Resp. at ¶ 52.)

As President of the FOP, Donahue was the final decision-maker regarding the cessation of Diemer's employment on November 2, 2004. (Pl. 56.1 Resp. at ¶ 60.) Donahue concluded that Diemer's employment with the FOP was no longer wanted before he even met with Diemer to discuss the *Taylor* matter. (Def. 56.1 Resp. at ¶ 106; Pl. Ex. 9, Donahue Dep. at 149-50.) Prior to November 2, the FOP had not discussed or planned to terminate Diemer based on her handling of the briefs in the Lockup Closure, *Moseley*, Canine Handler, or Timothy Thomas matters. (Pl. 56.1 Resp. at ¶ 73.)

---

[14] The Court notes that, again, Defendant frames this statement as one regarding what Dougherty testified to, rather than as an undisputed fact.

<u>The November 2, 2004 FOP-Diemer Meeting</u>

Later that day, Diemer met with Donahue at Donahue's request. (Pl. 56.1 Resp. at ¶ 55.) Also present at the meeting were Dougherty, Fallon, and Pleines. (*Id.*) Donahue told Diemer that he had been informed of what happened in the *Taylor* matter, but did not discuss with Diemer the details of what he had been informed of regarding the *Taylor* matter. (*Id.*; Def. 56.1 Resp. at ¶ 106.) Diemer apologized for what happened in the *Taylor* matter and told Donahue she felt awful about her mistake. (Pl. 56.1 Resp. at ¶ 55.) Donahue made a reference that the *Taylor* matter was the "final straw" and told Diemer that they were going to have to let her go, but wanted to give her an opportunity to resign. (*Id.*) During the conversation, Donahue also told Diemer that she filed a brief that they were unhappy with, but did not specify which brief, and noted that there were "other problems," but did not specify or discuss the nature of those problems. (Pl. 56.1 Resp. at ¶ 56; Def. 56.1 Resp. at ¶ 106.)

After apologizing again and stating that she did not think the FOP was unhappy with her work or that this warranted termination, Diemer signed a resignation letter that Donahue had given her. (Pl. 56.1 Resp. at ¶¶ 56-58.) Aside from Diemer's apologies regarding the *Taylor* matter, Donahue did not allow Diemer to discuss the matter with him during the meeting. (Def. 56.1 Resp. at ¶ 106.) Approximately one hour after this meeting, Diemer approached Donahue and gave him a handwritten letter revoking her resignation. (Pl. 56.1 Resp. at ¶ 59.)[15]

Later that day, Diemer also discussed her termination with Geiger. (Def. 56.1 Resp. at ¶

_____

[15] Donahue did not treat the letter as a revocation because he had previously accepted Diemer's resignation. (Pl. 56.1 Resp. at ¶ 59.) The parties now dispute whether this action constituted a revocation of Diemer's resignation. (Def. 56.1 Resp. at ¶ 110; Pl. 56.1 Resp. at ¶ 59.) The Court will not make a determination as to whether Diemer's letter amounted to a revocation at this juncture.

108.) During the conversation, Geiger told Diemer not to worry and that she would see "that this is the best thing that's ever happened to [her]." (*Id.*; Def. Ex. 6, Diemer Dep. at 272-73.) Shortly after November 2, 2004, Geiger again told Diemer that she would see that getting terminated from the FOP was the best thing that ever happened to her and that she should stay home with her baby. (Def. 56.1 Resp. at ¶ 108; Def Ex. 6, Diemer Dep. at 305-06.)

In December 2004, the FOP hired Daniel Herbert as additional in-house counsel. (Pl. 56.1 Resp. at ¶ 64.) Between 2002 and 2007, no issues were brought to the attention of Donahue, Dougherty, or Fallon concerning conduct engaged in by Geiger, Pleines, or Herbert while employed by the FOP that may have constitute malpractice or otherwise similar to Diemer's handling of the *Taylor* matter. (Pl. 56.1 Resp. at ¶ 65.) In addition, during this time period no one brought to Donahue's attention any claimed performance issue regarding Geiger's representation of Gerald Weber or Pleines's role in the *Majeske* matter. (*Id.*)

Diemer was never asked - during the November 2 meeting or otherwise - if she had, in fact, deleted the October 27 entry before she was terminated. (Def. 56.1 Resp. at ¶ 131.) Defendant admits that Diemer did not delete the entry from the FOP's electronic calendar. (Def. 56.1 Resp. at ¶ 96.)

<u>December 2004 Board of Directors Meeting</u>

On December 7, 2004, the FOP Board of Directors convened for its monthly, tape-recorded meeting. (Def. 56.1 Resp. at ¶¶ 112, 113.) The tape recorder is only turned off during these meetings to change the tape or when the Board, pursuant to a motion, convenes in an executive session. (Def. 56.1 Resp. at ¶ 112.) In his officer report during the December 7 meeting, Donahue stated:

> Ah, on the issue of in-house attorneys. Um, we ah had a rather difficult decision before us which turned out to be at first ah pretext was a difficult decision, turned out to be not so difficult after all. Ah, one of our in-house attorneys, Julie...it's off, right?

(Def. 56.1 Resp. at ¶ 113.) The tape recorder was then shut off, without a motion being made, for approximately seventeen minutes. (*Id.*)

Other Pregnancy Related Comments

In support of her discrimination claim, Diemer also submits for consideration the following four pregnancy-related comments made by FOP employees.[16]

First, in August 2003, when Diemer was engaged to be married, FOP officer Bella told Diemer that some FOP Board members were concerned about hiring a newlywed female because she might leave to start a family and take maternity leave. (Def. 56.1 Resp. at ¶ 128.) Second, between August 2004 and November 2, 2004, Geiger, who smoked cigarettes in the FOP office, told Diemer that he was doing her a favor by smoking around her because the second-hand smoke would result in a lower birth weight for the baby and an easier delivery for Diemer. (Def. 56.1 Resp. at ¶ 82.) Third, during that same time period, Geiger also told Diemer that he believed that all mothers should stay home and raise their children and that he would never let his wife work. (Def. 56.1 Resp. at ¶ 83.) Fourth, between September 4, 2004 and November 2, 2004, Fallon told Diemer that

---

[16] In Plaintiff's Statement of Additional Facts, Diemer also references a comment made by FOP officer Davis regarding Diemer posing nude and wearing revealing clothes as well as a comment made by FOP officer Capparelli regarding paternity tests. (Def. 56.1 Resp. at ¶¶ 84-85.) Derogatory remarks made by a non-decision maker are not considered evidence of an employer's discriminatory animus unless the non-decision maker: (1) provided input into the employment decision and (2) the remarks were made around the time of and in reference to the employment decision at issue. *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005)) (*citing Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000)). Because statements made by these two officers were not made in reference to Diemer's termination and there is no evidence that Officers Davis or Capparelli provided any input into the employment decision, the Court will not consider such statements as evidence of discriminatory animus on the part of FOP.

a benefit of pregnancy was increased breast size and asked Diemer when this would happen to her. (Pl. 56.1 Resp. at ¶ 63.)

Diemer has no evidence suggesting that Donahue, Dougherty, or Pleines ever made a negative comment related to Diemer's pregnancy. (Pl. 56.1 Resp. at ¶ 62.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

An employment discrimination claim will survive summary judgment if the plaintiff either: (1) presents sufficient evidence of discriminatory motivation to create a triable issue of fact (the "direct method") or (2) establishes a *prima facie* case of discrimination under the "burden shifting" method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), (the "indirect method"). *Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007). The Court finds that Diemer has put forth sufficient evidence to create a triable issue under the direct method of proof, but fails to establish a *prima facie* case under the indirect method of proof.

I.     *Direct Method*

Under the "direct method," a plaintiff may use two different kinds of evidence to demonstrate that her discharge was the result of pregnancy discrimination: (1) "direct evidence" or (2) "circumstantial evidence." *Id.* Direct evidence of discrimination is evidence which, if believed by the trier of fact, "will prove the particular fact in question without reliance or inference or presumption." *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999) (*quoting Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997)) (internal quotation omitted). The typical direct evidence situation is an admission by the decision maker that he acted upon the discriminatory animus. *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006). Nevertheless, direct evidence "does not require 'a virtual admission of illegality'" or an explicit reference to the plaintiff's protected status. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999). Instead, "It is evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Walker v. Bd. of Regents of the Univ. Of Wis. Sys.*, 410 F.3d 387, 394 (7th Cir. 2005) (*quoting Troupe v. May Dep't Stores, Co.*, 20 F.3d 734, 736 (7th Cir. 1994)) (internal quotation omitted).

Plaintiffs more commonly use circumstantial evidence to show discrimination under the direct method. Circumstantial evidence is proof that "suggests discrimination albeit through a longer chain of inferences." *Lewis*, 496 F.3d at 651 (*quoting Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006)) (internal quotation omitted). The plaintiff will use evidence to construct "'a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Phelan*, 463 F.3d at 779-80 (*quoting Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). There are three main types of circumstantial evidence: (1) suspicious timing, ambiguous oral or written statements, or behavior directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for, but failed to receive the desired treatment, and the employer's stated reason for the for the difference is pretext. *Id.* at 781 (*citing Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005)). The circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Diemer argues that she has presented direct as well as circumstantial evidence sufficient to establish a question of fact regarding the FOP's discriminatory intent. In regards to the "direct evidence," Diemer contends that Geiger's statements and actions constitute direct evidence of discrimination, despite the fact that Geiger was not the ultimate decision maker. (Pl. Opp. Br. 8.) Specifically, Diemer argues that Geiger's alleged discriminatory animus may be imputed to the FOP because Geiger concealed relevant information from and fed false information to the ultimate decision maker, Donahue. In addition, Donahue did not conduct an investigation sufficient to sever

the link between Geiger's discriminatory animus and Donahue's ultimate decision to terminate Diemer. The Court agrees that Diemer has provided sufficient evidence to create a triable issue as to the FOP's discriminatory animus and, therefore, need not address the merits of her circumstantial proof arguments.

*A. Direct Evidence of Discriminatory Animus*

Words, actions, and motivations of an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment may be imputed to the decision maker if the employee without formal authority exercises "singular influence" over a decision maker who does have such power. *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612-13 (7th Cir. 2005)). Singular influence is defined as "so much influence as to basically be herself the true 'functional[]. . . decision-maker.'" *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 917 (7th Cir. 2007) (*quoting Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004)) (alteration in original). For example, where the decision maker is "totally dependant" on the non-decision maker to supply information on which the decision is based, the non-decision maker who supplied the information is the "true, functional decision maker." *Id.* at 918.

"In some situations, the influence can be exercised by supplying misinformation or failing to provide relevant information to the person making the employment decision." *Id.* However, "where a decision maker is not wholly dependant on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decision maker." *Id.* (*citing Byrd v. Dep't of Pub. Health*, 423 F.3d 696, 708 (7th Cir. 2005)). "It does not matter that in a particular situation much of the information has come from a single, potentially biased source, so long as the decision

maker does not artificially or by virtue of her role in the company *limit her investigation to information from that source*." *Id.* (emphasis added). Where the decision maker conducts only a perfunctory or "[m]ere paper review" of the non-decision maker's recommendation, that review will not shield the employer from liability if that recommendation was motivated by unlawful bias. *See id.* at 918. Thus, the employer will not be liable under Title VII "so long as the decision maker independently investigates the claims before acting." *Id.* at 920.

The inquiry, therefore, is first, whether the evidence indicates discriminatory animus on the part of Geiger; and second, if so, whether this alleged animus may be imputed to Donahue, who possessed and exercised the authority to terminate Diemer. In particular, the issue is whether Geiger possessed the requisite degree of "singular influence" over Donahue's decision to terminate Diemer or if Donahue conducted an independent investigation into Diemer's alleged misconduct in order to absolve Defendant of Title VII liability.

## I. Issue One: Geiger's Alleged Discriminatory Animus

Generally, derogatory statements made by a non-decision maker are not evidence that discriminatory animus motivated the employment decision at issue. *Rozskowiak*, 415 F.3d at 612 (*citing Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)); *see also Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) ("[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus."). However, "if the person who made the derogatory remarks provided input into the employment decision – and the remarks were made around the time of and in reference to that decision – 'it *may* be possible to infer that the decision makers were influenced by those [discriminatory] feelings.'" *Rozskowiak*, 415 F.3d at 612 (*quoting Hunt v. City of Markham, Ill.*, 219

F.3d 649, 652-53 (7th Cir. 2000)) (emphasis supplied by the *Rozskowiak* court). Such discriminatory remarks are only actionable if there is a real link between the derogatory comments and the adverse employment action. *Id. (citing Gorence v. Eagle Food Ctrs. Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)). In support of her argument that Geiger possessed discriminatory animus, Diemer points to four separate statements made by Geiger: (1) Geiger's statement, made between August 2004 and November 2, 2004, that all mothers should stay home and raise children and that he would never let his wife work; (2) Geiger's comment, during the same time frame, that second-hand smoke would result in a lower birth weight; (3) Geiger's comment, made on November 2, 2004 after Diemer informed him of her termination, that she would see "this is the best thing that's ever happened to [her]"; and (4) Geiger's statement, made shortly after November 2, 2004, reinforcing that the termination was for the best and that she should "stay home with the baby." (Pl. Opp. Br. 7-8.)

The FOP contends that these statements constitute "stray remarks" because the evidence does not suggest a sufficient link between Geiger's comments and the FOP's decision to terminate Diemer. (Def. Reply Br. 7-8.) The Court agrees with the FOP as to the first three statements. The first and second comments are unrelated to Diemer's termination and, therefore, are "stray remarks." *See, e.g., Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998) (comment made five months before plaintiff's termination to the effect of "if you were my wife, I would not want you working after having children" was not temporally or causally related to plaintiff's discharge). In addition, because Diemer has made no showing that the third comment relates to Diemer's pregnancy, the third statement cannot be considered direct evidence of discriminatory motive.

The Court disagrees with the FOP's characterization of Geiger's fourth statement as a "stray remark." Geiger's fourth statement directly refers to Diemer's termination. A statement need not explicitly refer to Diemer's pregnancy for a reasonable jury to conclude that it is evidence of a discriminatory motive. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999). To the extent that the discriminatory nature of this statement is ambiguous, "'the task of disambiguating ambiguous utterances is for trial, not for summary judgment.'" *Phelan*, 463 F.3d at 782 (*quoting Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990)). Thus, a reasonable jury could conclude that Geiger's comment reflects discriminatory animus. *See, e.g., Sheehan*, 173 F.3d at 1044-45 (supervisor's statement that plaintiff was fired so she could "spend more time at home with her children" reflected unlawful motivation). Finally, in regards to the timing, the FOP admits that Geiger made the fourth statement on a date "shortly after" November 2, 2004. While neither party gives a date certain for the fourth statement, the Court, drawing all reasonable inferences in favor of the party opposing the motion, concludes that a reasonable jury could find that the fourth statement was made around the time of Diemer's termination.

### ii. Issue Two: Imputing Discriminatory Animus

Having found that Diemer presented sufficient evidence of Geiger's alleged discriminatory animus, the Court must determine whether a reasonably jury could conclude that this unlawful motivation may be imputed to the FOP, and to Donahue specifically. Diemer contends that Geiger's unlawful motivation may be imputed to Donahue because Geiger improperly influenced Donahue's decision by providing false information to and concealing relevant information from the FOP. Specifically, Diemer argues that Geiger: (1) falsely reported that the October 27 entry had been removed and that Diemer attempted to conceal the fact that the City filed a motion to dismiss; (2)

falsely reported to Dougherty that the City's Motion had been granted; (3) failed to disclose that Geiger only assumed that Diemer removed the October 27 entry; and (4) failed to disclose that Diemer spoke with Geiger on October 28, 2004 about the Motion and her plan to rectify the problem.[17] (Pl. Opp. Br. 9.)  For the sake of clarity, the Court will address each of these arguments individually.

First, in regards to Geiger's alleged false reports regarding Diemer's attempt to conceal the Motion, the record reveals a question of fact as to whether Geiger actually relayed this information to the FOP.  As noted above, the parties dispute whether Dougherty's conclusions regarding Diemer's alleged "secreting" were based solely on his conversations with Geiger.  In addition, it is also unclear whether Geiger told Donahue that Diemer "secreted" the *Taylor* matter.  As previously noted, it is undisputed that Donahue *testified* that Geiger verified Dougherty's statements to Donahue regarding Diemer's "secreting." This fact proves only that Donahue *testified* as such.  It does not confirm whether the parties admit that Geiger, in fact, discussed Diemer's alleged "secreting" with Donahue.

Second, the parties also dispute whether Geiger falsely reported to Dougherty that the City's Motion had been granted.  The FOP argues that this dispute is irrelevant because Diemer admitted to Dougherty that the Motion would likely be granted.  According to the FOP, whether Dougherty understood the actual status of the ruling is immaterial.  The Court disagrees.  Assuming that

---

[17]  Diemer also contends that Geiger: (1) falsely reported that Moorman docketed the date of the Motion in the electronic calendar; (2) failed to disclose that Diemer's oversight was correctable and Geiger found Diemer's plan to cure the problem acceptable; (3) failed to disclose that Geiger never asked Diemer for the Motion; (4) failed to disclose that Diemer had never hidden a mistake from Geiger in the past; and (5) failed to disclose that Geiger had previously filed and untimely complaint that resulted in a similar motion to dismiss and that Geiger "secreted" this incident.  (Pl. Opp. Br. 9.)  The Court notes that these assertions are either not supported by the record or are unnecessary in light of the Court's conclusion above.

Dougherty, based on Geiger's assertions, informed Donahue that the Motion had been granted, this information may have further exacerbated the perceived seriousness of what Dougherty and Donahue believed to be Diemer's attempt to hide issues related to the *Taylor* matter.

Third, in regards to Geiger's alleged failure to report that he only assumed that Diemer deleted the entry, the FOP admits that Geiger made this assumption. The evidence presented does not address whether Geiger actually reported on or concealed this matter from the FOP. Because Diemer fails to support this assertion with a record citation, the Court will not consider this alleged omission in the current analysis.

Finally, the parties dispute and the record is unclear as to whether Geiger informed anyone about his conversations with Diemer regarding the *Taylor* matter. While Geiger's failure to disclose Diemer's plan to have Officer Taylor attempt to register a new gun may be irrelevant because Diemer discussed the plan with Dougherty, a reasonable jury could find that Diemer's discussions with Geiger illustrate that Diemer did not attempt to "secret" the Motion from the FOP. Thus, this also remains a question of fact for the purposes of summary judgment.

Putting to one side the numerous questions of fact related to Geiger's alleged false reports and omissions, the Court notes that Diemer must also provide evidence suggesting that Geiger possessed the requisite degree of "singular influence" over Donahue, the decision maker in this case. *See Brewer*, 479 F.3d at 917. Diemer argues that Geiger was the only source of information in the process that resulted in her termination. (Pl. Opp. Br. 10.) The FOP contends, however, that Geiger did not exert the singular influence over Donahue because Moorman, Diemer, and Dougherty also provided input into Donahue's decision. (Def. Rep. Br. 4-5.) Donahue received input regarding Diemer's handling of the *Taylor* matter from two main sources: Dougherty and Geiger. Dougherty,

in turn, received information from Moorman, Geiger, and Diemer. Evidence indicates that Moorman, Dougherty, and Diemer were all involved, at least peripherally, in the process that resulted in Diemer's termination. Nevertheless, there remains a question of fact as to the degree of Geiger's influence and the adequacy of Donahue's investigation before Diemer was terminated.

While Moorman first informed Geiger of the Motion and participated in the October 29 meeting with Geiger and Dougherty, it was Geiger who brought the Motion to Dougherty's attention on October 18 and told Dougherty that he would look into the matter. In addition to Geiger's October 18 meeting with Dougherty and October 29 meeting with Dougherty and Moorman, Geiger also met with Dougherty to discuss the *Taylor* matter for a third time on November 1. The Court has already concluded that there remains a question of fact as to whether Dougherty's conclusion regarding the "secreting" was based solely on the information provided by Geiger. Given the ambiguity surrounding Geiger's potential influence on Dougherty and the seemingly disproportionate amount of information that Dougherty received from Geiger, the Court concludes that there also remains a question of fact as to what, if any, influence Moorman had on Dougherty's and Donahue's conclusions.

The Court finds similar problems with the FOP's contention that Diemer's involvement in the decision-making process eliminates the possibility that Geiger possessed the requisite degree of influence. While Diemer discussed the *Taylor* matter with Geiger and Dougherty before Diemer's termination, the record reflects factual disputes that speak to question of whether these conversations actually affected Donahue's decision-making process. Specifically, there remains a question of fact as to whether Geiger informed anyone at the FOP of his discussions with Diemer and, as noted above, whether Dougherty's conclusion regarding the "secreting" was based solely on the

information provided by Geiger. Notably, Dougherty informed Donahue of the Motion before he even spoke to Diemer about the matter. While Donahue also spoke directly to Diemer on November 2, he did so only after he decided that the FOP no longer desired Diemer's employment.

Furthermore, the record also reveals the existence of a question of fact as to the adequacy of Donahue's investigation into Diemer's handling of the *Taylor* matter before Diemer was terminated. Dougherty informed Donahue of the Motion at some point between October 29 and November 1. Evidence suggests that Dougherty also reported to Donahue that Geiger informed Dougherty of the misfiling, told Donahue that Diemer had attempted to "secret" the matter from the FOP, and recommended that Diemer be fired. Donahue then spoke to Geiger - the original source of the allegations - to verify the truth of Dougherty's allegations. Donahue did not speak with Diemer about her handling of the *Taylor* matter until after he decided to terminate her. Even then, Donahue did not discuss with Diemer the details of what he had been informed of regarding the *Taylor* matter and, aside from her apologies and expressions of regret, did not allow Diemer to discuss the matter further. Thus, while Donahue spoke with Diemer in addition to Dougherty and Geiger, there remains a question of fact as to the sufficiency of Donahue's attempt to investigate the allegations surrounding Diemer's handling of the *Taylor* matter. *See, e.g., Brewer*, 479 F.3d at 920 (independent investigation conducted where decision maker examined a parking tag that plaintiff improperly modified to confirm that it had been altered); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 752 (7th Cir. 1998) (decision maker acted independently when she read an incident report created by the non-decision maker with allegedly discriminatory motive, spoke with plaintiff's supervisor, and confronted the plaintiff with the allegations); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 544-48 (7th Cir. 1997) (independent investigation conducted where decision maker invited

plaintiff to provide the decision maker with additional information regarding her claims of discrimination, but plaintiff failed to provide any details). A reasonable jury could find that Donahue relied on Dougherty, who received a disproportionate amount of his information from Geiger, as well as Geiger himself.

In sum, the Court finds that there are genuine factual disputes as to whether and to what extent Geiger was involved with the decision to terminate Diemer. In addition, the Court concludes that a jury could reasonably find that Geiger's alleged animus motivated the employment decision at issue. Thus, Diemer has provided sufficient direct evidence to survive summary judgment under the "direct method." Because the Court finds that Diemer has presented sufficient evidence under the "direct method," the Court need not consider the merits of Diemer's circumstantial evidence arguments.

## II.     Indirect Method

To establish a *prima facie* case of pregnancy discrimination in termination cases under the indirect method, courts have more commonly required the plaintiff to establish that: (1) she was pregnant (a member of a protected class), and her employer knew that she was pregnant; (2) she was performing her duties satisfactorily; (3) she was discharged; and (4) similarly situated employees not in the protected class were treated more favorably. *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001); *see also Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007). If the plaintiff makes out the *prima facie* case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *Id.* Once such a reason is given, the burden then returns to the plaintiff to show that the employer's explanation was pretextual. *Id.*

With respect to the fourth element, Diemer contends that she need only prove that the FOP hired someone to perform Diemer's job after her termination rather than the traditional "similarly situated" requirement.[18] Because Diemer's discrimination claim survives under the "direct method," the Court need not address whether her claim survives under the "indirect method" or, consequently, whether she must meet the "similarly situated" requirement. Assuming, for the sake of argument, that Diemer was required to prove this element, the Court concludes that the evidence presented could not establish that the FOP treated similarly situated employees who were not in the protected class more favorably.

### A. Similarly Situated Requirement

To be similarly situated, another employee must be comparable to the plaintiff "in all material respects." *Plummer v. Potter*, No. 06-3039, 2007 U.S. App. LEXIS 11827, at *4 (7th Cir. May 17, 2007) (*citing Brummett v. Sinclair Broad. Group*, 414 F.3d 686, 692 (7th Cir. 2005)) (internal quotation omitted). In determining whether employees are similarly situated in disciplinary cases, the plaintiff must show that he or she is similarly situated with respect to performance, qualifications, and conduct. *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005). This normally

---

[18] In support of this argument, Diemer cites to *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840 (7th Cir. 2007). In *Pantoja*, the Seventh Circuit modified the fourth element of the *prima facie* case when it concluded that the plaintiff, Juan Pantoja, need only show that his former employer sought someone to replace him after his termination. 495 F.3d at 846. Pantoja argued that the employer's job expectations were themselves tainted with discrimination such that the employer had applied certain standards to plaintiff but not similarly situated employees who were not members of the same protected class. *See id.* at 846-47. Nearly two months after *Pantoja*, the Seventh Circuit reverted back to the traditional "similarly situated" requirement in *Henry v. Jones*, No. 06-3855, 2007 U.S. App. LEXIS 25491 (7th Cir. Nov. 1, 2007). In that case, plaintiff Robert Henry brought a reverse discrimination suit, contending that he was terminated because he was white. *Id.* at *10. The *Henry* court distinguished *Pantoja*, noting that the plaintiff in *Pantoja* did not argue that he met his employer's legitimate expectations, but rather, that the employer's expectations were tailored to plaintiff's race. *Id.* at *15-16. Thus, because Henry could not meet the similarly situated requirement or prove that his employer tailored its expectations to Henry's race, he could not establish a *prima facie* case of discrimination. *Id.* at *16.

includes "a showing that the employee held the same type of job, was disciplined by the same supervisor, was subject to the same standards, had comparable experience and qualifications, and had engaged in the same conduct without differentiating or mitigating circumstances." *Plummer*, 2007 U.S. App. LEXIS 11827, at *4 (*citing Brummett v. Sinclair Broad. Group*, 414 F.3d 686, 692 (7th Cir. 2005)). Ultimately, the employee must show *substantial similarity*, rather than complete identity, when comparing himself to the favorably treated employee. *Humphries v. CBOCS West, Inc.*, 474 F.3d 397, 405 (7th Cir. 2007).

The Seventh Circuit recently emphasized that the similarly situated analysis "is a flexible one that considers 'all relevant factors, the number of which depends on the context of the case.'" *Id.* The purpose of the requirement is to "determine whether there are enough common factors between a plaintiff and a comparator–and few enough confounding ones–to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lily & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) (*citing Humphries v. CBOCS West, Inc.*, 474 F.3d 397, 406 (7th Cir. 2007)). Thus, the inquiry asks whether there are sufficient commonalities between the would be "comparator" and the plaintiff to allow the type of comparison that would allow the jury to reach an inference of discrimination. *Humphries*, 474 F.3d at 405.

Diemer presents evidence regarding two employees that she claims were similarly situated and treated more favorably: Geiger and Pleines. Specifically, Diemer argues that Geiger committed an infraction identical to the one he accused Diemer of committing when he filed an untimely complaint in the *Weber* case and "secreted" this misfiling. (Pl. Opp. Br. 18.) Diemer also contends that Geiger waited two weeks before informing anyone at the FOP about the Motion. (Pl. Opp. Br.

19.)  In regards to Pleines, Diemer asserts that Pleines "secreted" his absence at the *Majeske* oral argument from the FOP.  (Pl. Opp. Br. 19.)

In response, the FOP argues that Geiger was not similarly situated because he was not an FOP employee when he misfiled the *Weber* complaint.  (Def. Mem. Supp. Summ. J. 21; Def. Reply Br. 11.)  In addition, Pleines cannot be considered similarly situated because his duties, position, and experience varied significantly from that of Diemer and because, unlike Diemer, Pleines was not the attorney of record in *Majeske*.  (Def. Mem. Supp. Summ. J. 21; Def. Reply Br. 11.)  Finally, the conduct of both men occurred several years before Diemer's resignation and before Donahue became President of the FOP.  (Def. Mem. Supp. Summ. J. 21; Def. Reply Br. 11.)

The Court agrees with the FOP's arguments and finds that Diemer has not adequately shown sufficient commonalities between Diemer and her would be "comparators," Geiger and Pleines. Geiger's alleged "secreting" in the *Weber* case and Pleines alleged "secreting" in the *Majeske* case occurred approximately three and eight years before Diemer's resignation, respectively.  Both occurred when Nolan, not Donahue, was President of the FOP.  Dealing with the same "decision-making" personnel is an important consideration in determining whether an employee is similarly situated.  *See Humphries*, 474 F.3d at 405; *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 626 (7th Cir. 2006).  Furthermore, because Geiger and Pleines were subject to a different set of overseers, there is no evidence that there were subject to the same employment standards.  *Keri*, 458 F.3d at 626.

In addition, the evidence presented does not support a conclusion that Diemer had a comparable position, experience, or qualifications with Geiger and Pleines at the time of the Weber and *Majeske* matters or at the time of Diemer's alleged "secreting."  Unlike Diemer, who held the

position of an in-house attorney at the time of the alleged "secreting," Geiger was a solo practitioner who was paid by the FOP to work on the Weber matter and Pleines was General Counsel at the time of *Majeske*. Further, at the time of the *Taylor* matter, Pleines and Geiger had approximately eleven years and two years of experience working for the FOP, as compared to Diemer's one year of experience. Despite Diemer's assertion to the contrary, different job descriptions and work experience also weigh against a finding of "similarly situated." *See, e.g., Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004) (identifying work experience as a relevant consideration). The Court also notes that Geiger's failure to immediately inform the FOP of Diemer's untimely filing and Diemer's perceived "secreting" of the *Taylor* matter do not constitute a comparable set of failings. *See Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Thus, for the reasons stated, the lack of discipline against Geiger and Pleines for their alleged "secreting" "'sheds no light' on the disciplinary decision in this case." *Plummer,* 2007 U.S. App. LEXIS 11827, at *5 (*quoting Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004)).

Nevertheless, as noted above, because she has provided sufficient proof under the "direct method," Diemer's discrimination claim survives Defendant's Motion for Summary Judgment.

## CONCLUSION AND ORDER

For the reasons stated herein, Defendant's Motion for Summary Judgment is denied. So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: November 29, 2007

33